STATE ex rel. TAYLOR, Public Administrator, Relator and Appellant, v. WURDEMAN,. Respondent.

St. Louis Court of Appeals, February 18, 1908.

1. **INSANE PERSONS: Inquisition: Jurisdiction.** In the absence of any statute regulating the procedure, the rule always followed is that the chancery or probate court of the residence of a supposed lunatic is the proper forum to conduct an inquiry as to his mental state.

2. ———: **Residence: Wife and Husband.** The residence of the husband is the residence of the wife and continues to be her residence even though she is an inmate of an insane asylum elsewhere.

3. ———: ———: ———: **Death of Husband.** Where a woman was married in Jasper county and continued to live there several years with her husband until she was adjudged insane and committed to an asylum in St. Louis county, she continued to be a resident of Jasper county even after the death of her husband.

4. ———: ———: Inquisition: Jurisdiction. Where a married woman in Jasper county and having property there was committed to an insane asylum in St. Louis county, and while confined there her husband died in Jasper county, the probate court of the latter county had jurisdiction to inquire into her sanity and appoint a guardian to manage her affairs, under provisions of sections 3650, 3653, Revised Statutes 1899; the residence of the alleged lunatic in the county gave the court jurisdiction notwithstanding she was not actually *in* the county at the time; the words "in his county" used in section 3650 must be construed with the words "resident in his county" used in section 3653.

Appeal from St. Louis County Circuit Court.—*Hon. Jno. W. McElhinney,* Judge.

AFFIRMED.

*W. F. Broadhead* and *J. C. Kiskaddon* for appellant.

(1) Under the statute any person has the right to inform the probate court that there is a person of unsound mind in its county, and upon such information it is the duty of the probate court to proceed to a hearing as provided by statute to ascertain whether the person complained of is sane or insane. This information can be made by an "unofficial person." Sess. Acts 1903, p. 200; R. S. 1899, secs. 3650 et seq. (2) It is the duty of the public administrator, as public guardian, to take into his charge and custody "the estates, or persons and estates, of all insane persons in his county who have no legal guardian, and no one competent to take charge of such estate, or to act as such guardian, can be found, or is known to the court having jurisdiction, who will qualify." R. S. 1899, sec. 292. (3) The word "in" as used in the statute in question, we cannot find has been construed in this State in this or any analogous case, but it has been construed in several other jurisdictions. Railroad v. Insurance Co., 32 Md. 41; Railroad v. Dunbar, 100 Ill. 136; Kean v. Rice, 12 S. & R. (Pa.) 205; Hilgus v. Quincy, 51 Wis. 70; Woods v.

State, 67 Miss. 575; Scaler v. Assn., 70 N. H. 490; Barnard v. McKenzie, 4 Colo. 253. The latest, fullest and most critical English lexicon defines the word "in," as used in the statute in question, as meaning locality solely, and nowhere intimates that it is synonymous or equivalent to "domicil." 5 Murray Oxford Dict., "In." (4) It follows that if the word "in" as used in the statute has that one ordinary meaning, and no other technical meaning, then the courts would not be justified, by construction, to give it any other than the ordinary meaning. R. S. 1899, sec. 4160; State v. Miller, 182 Mo. 370. Especially when it is obvious that without an express or implied exception the Legislature intended the insane to be cared for in the locality where found or "discovered," so as to protect them and the community. Grimes v. Reynolds, 184 Mo. 679; State v. Moore, 96 Mo. App. 431; Bowerman v. Mining Co., 98 Mo. App. 308.

*Farris & Matthews* with *W. H. Phelps* for respondent.

(1) Where a lunatic is in an asylum a commission of lunacy should be issued to the county where his mansion house and property are, or where his last residence was before he came to the asylum. In re Child, 16 N. J. Eq. 498. The residence of the husband is the residence of the wife, and the residence of the husband being the residence of his wife, though she may be confined in an insane asylum in another county, . . . gives the court of the county of the husband's residence jurisdiction of proceedings for the appointment of a guardian on the decease of the husband. Schwartz v. West, 84 S. W. 282; Foreman v. Meroney, 62 Tex. 723; Hall v. Fields, 81 Tex. 553, 17 S. W. 82; Ex parte Baker, 1 Cooper's Ch. Cas. 205, 19 Vesey, 340; Ex parte Hall, 7 Vesey 260; Ex parte Smith, 1 Swan. 4. (2) The husband's domicile is, in law, the domicile

of the wife and continues to be the same throughout their marriage.    Mannor v. Cardwell, 37 Mo. 350; McPherson v. McPherson, 70 Mo. App. 330; Jenness v. Jenness, 24 Ind. 355; 87 Am. Dec. 335; 2 Wait's Action, 638. Mrs. Connor being insane she could not change her domicile, since she is incapable of exercising the volition essential to effect the change.    Pellsfeld v. Detroit, 53 Me. 442; Payer v. Danham, 29 Ill. 128.    (3) The same principle applies in this case as that of an infant of unsound mind which confers on the father the right of choice in the domicile of the child, the father's change of domicile works a change of domicile for the child, hence the same rule would apply to the wife.    Sharpe v. Crespen, 1 Prob. Dic. 611; Marheineke v. Grothaus, 72 Mo. 204; 7 Lawson's Rights & Remedies, sec. 3841. (4)    The fact that Mrs. Connor was an inmate of a Sanitarium in St. Louis county at the time of her husband's death and was there for the purpose of receiving medical treatment, has no effect upon the domicile and it makes no difference whether the restraint is physical or moral.    Grant v. Dalliber, 11 Con. 234; Dowville v. Pulney, 6 Vt. 512.    Physical state or residence in any particular will not, of itself, constitute a domicile. State ex rel. v. Dayton, 77 Mo. 678; Lewis v. Costello, 17 Mo. App. 593.    (5) The fact that one is confined in an asylum in another county does not affect the residence or the jurisdiction of the court of his residence to appoint a guardian for him.    Lacy v. Williams, 27 Mo. 280; Marheineke v. Grothaus, 72 Mo. 204; Flynn v. Hancock, 80 S. W. 245.

GOODE, J.—This is a proceeding to compel the judge of the probate court of St. Louis county to reinstate and hear an information filed in said court by the relator D. C. Taylor, public administrator of said county, stating Mrs. Melissa Connor is of unsound mind and incapable of attending to her own affairs, and asking that

an inquiry concerning her mental condition be held. The probate court dismissed said proceeding May 30, 1907, on the ground of a prior adjudication concerning the insanity of Mrs. Connor by the probate court of Jasper county, wherein she was adjudged to be of unsound mind and incapable of managing her affairs, and W. H. Phelps, who had moved to dismiss the proceeding in the St. Louis county probate court, had been appointed guardian and had given bond and qualified as such.    As there is no dispute about the facts and the question at issue is one at law, it will be unnecessary to recite the pleadings.    The information was filed by the relator D. C. Taylor, in the probate court of St. Louis county, on April 10, 1907, and Mrs. Connor was duly notified of the proceeding and that there would be a hearing thereof April 17th; but on April 17th Mr. Phelps, who had been appointed guardian in Jasper county, moved to dismiss the cause and it was dismissed, as stated, on the ground of the prior adjudication in the probate court of Jasper county.    The latter proceeding was instituted on or about April 2, 1907, or eight days before the filing of the information by relator in the St. Louis county probate court. The informant in Jasper county was E. O. Brown, who, in his written information, represented to the probate court of said county that Mrs. Connor resided in said county, had no children, owned both real and personal estate in Jasper county, was a person of unsound mind and incapable of managing her affairs, and prayed the court to have a jury inquire into Mrs. Connor's sanity, and to take all due proceedings in accordance with the laws of this State in such case made and provided.    On the filing of that information a notice or process was issued under the hand and seal of the judge of the Jasper probate court, to Mrs. Connor, notifying her of the filing of the information by Brown and its contents, and that an inquiry concerning the matters alleged would be

heard in the probate court room, in the court house in the city of Carthage, Jasper county, Missouri, at nine o'clock on the eighth day of April, 1907, before a jury, as required by law; and further notifying her she might appear and show cause, if any she had, why a guardian should not be appointed to take charge of and attend to her business affairs.    This notice was duly served on Mrs. Connor in the county of St. Louis and State of Missouri, on April 6, 1907, by delivering to and leaving with her a true copy.    On April 8th, said proceeding concerning the sanity of Mrs. Connor came on to be heard in the Jasper county probate court before a jury, and resulted in a verdict that she was of unsound mind and incapable of managing her affairs; whereupon the court adjudged she was of unsound mind and incapable of managing her own affairs, appointed W. H. Phelps guardian of her person and estate, ordered him to give bond in the sum of one hundred thousand dollars, which bond was given and approved and Phelps entered upon the discharge of his duties.    The record of the proceeding in the Jasper probate court recites the filing of the information by Brown wherein it was stated Mrs. Connor was a resident of Jasper county, Missouri, owning both real and personal estate in said county; that she was of unsound mind and incapable of managing her affairs; recited, further, that the court found due notice of the proceeding had been given to Mrs. Connor by personal notice of the information, and that it further appeared to the court Mrs. Connor's mental and bodily condition was such she had to be daily and constantly watched and could not be safely brought before the court, and therefore her presence and attendance on the investigation was dispensed with.    The information filed by the relator Taylor in the probate court of St. Louis county stated, along with the averments regarding the insanity and incapacity of Mrs. Connor, that she was, at the time of the filing of the information,

in the county of St. Louis and confined in St. Vincent's Institution for the Insane, an asylum located therein. It is contended by the relator that the proceeding in Jasper county was *coram non judice* because, on the face of the files and records therein it appeared Mrs. Connor was not in Jasper county when the proceeding for an inquiry was instituted, or when the hearing occurred, but on the contrary was in St. Louis county in St. Vincent's Asylum, and that she was served in said county with the process issued from the Jasper court. Relator's contention is that on this showing it is apparent the Jasper court was without jurisdiction, and therefore its judgment was a nullity and did not stand in the way of the proceeding instituted later by the relator in the St. Louis county probate court; and hence the latter court erred in dismissing the proceeding before it and ought to be made to reinstate it and proceed to a hearing and judgment. This mandamus proceeding came on for hearing in the circuit court of St. Louis county on issues joined, and after evidence had been introduced on the issues, the court refused a peremptory writ and an appeal was prosecuted.

The evidence proves without dispute these facts: Mrs. Melissa Connor was the wife of Thomas Connor, now deceased. He resided in Jasper county continuously from 1872 until his death March 29, 1907, and accumulated a large estate situate almost entirely in that county. His wife also resided there previous to their marriage. They were married in 1874 and lived together continuously in the city of Joplin in Jasper county, until 1886, when she became insane and was placed by her husband temporarily, as was supposed, in the St. Vincent Sanitarium, an institution for the treatment and care of the insane. This institution was then located in the city of St. Louis, but was subsequently removed into St. Louis county, outside the city limits. Mrs. Connor so far recovered her reason

in 1889 as to be able to return to Jasper county, where she remained a short time, but on account of the return of her malady was placed again in the St. Vincent institution and has been there continuously until the present time as an insane patient.    During his lifetime her husband provided bountifully for her comfort and treatment by the authorities and attendants of the asylum, and in his last will bequeathed to her the income from $100,000, to be paid to her annually in case she recovered her mind.    As long as she remained in a state of mental unsoundness, there was to be set apart and paid for her care and support the sum of $150 a month, and such further sums as might be necessary, in the opinion of the Sisters of Charity at St. Vincent's Asylum, for her comfort, care and treatment.    The will said the testator wished her to have at all times and under all circumstances the best possible care and treatment that could be provided.    After the death of Mr. Connor, his executors qualified and conducted the administration of his estate under the direction of the probate court of Jasper county, Missouri, and have carried out the provisions of his will in relation to his wife. Apart from the bequest to her in her husband's will and her interest in his estate, Mrs. Connor owns property in her own name worth six or seven thousand dollars, all in Jasper county, except the furnishings of her room in St. Vincent's Asylum.    It was admitted Mr. Connor and his wife resided in Joplin after they were married, until she was brought to St. Vincent's for treatment and that he maintained and supported her until his death.

The point of law at issue arises on the construction of section 3650 of the statutes.    This section says if information in writing be given to the probate court that any person *in its county* (italics ours) is an idiot, lunatic or person of unsound mind and incapable of managing his affairs, and praying an inquiry be had, the

court, if satisfied there is good cause for the exercise of its jurisdiction, shall cause the facts to be inquired into by a jury; provided, the probate court shall not have jurisdiction to inquire into the sanity of any person who is the owner of no property. [Mo. Ann. Stat. 1906, ch. 29, sec. 3650; R. S. 1899, sec. 3650 as amended by the laws of 1903, p. 200.] Relator contends said statute forbids any probate court to entertain an inquiry concerning the mental state of a person alleged to be of unsound mind, or to appoint a guardian for such person, if adjudged to be mentally unsound, unless the person who is the subject-matter of the inquiry is *in* the county where the probate court exercises jurisdiction at the inception of the proceeding. This contention is supplemented by another, to-wit; that it appears affirmatively on the face of the files and records of the proceeding in Jasper county, that Mrs. Connor was not in said county, either when the information regarding her mental unsoundness was filed, or when she was served with the notice of the hearing, or at the time of the hearing; and hence no presumption of her presence in the county can be indulged in support of the proceeding in said court, which must be treated as a nullity and as affording no cause for the dismissal of the proceeding instituted by relator in the probate court of St. Louis county. Neither the information filed by Brown nor the recitals in the record of the Jasper proceeding stated Mrs. Connor was in Jasper county, but both stated she was a resident of said county. In passing on this appeal we put out of view the question of whether mandamus is the appropriate remedy, and also the question of whether or not the adjudication in the Jasper court that Mrs. Connor was of unsound mind and the appointment of her guardian, is conclusive against collateral attack and the Jasper county probate court will be presumed to have found all the facts existed requisite to its jurisdiction. One proposition urged in fa-

vor of the respondent is that, whether or not Mrs. Connor was in Jasper county at the inception or during any stage of the proceeding therein, it must be conclusively presumed the Jasper county probate court found she was in the county, if this fact was essential to the exercise of its jurisdiction; and in support of this proposition we are cited to Johnson v. Beasley, 65 Mo. 259; In re Est. of Davison, 100 Mo. App. 263, 73 S. W. 373, and other cases. For the relator it is contended in this connection, that the presumption which ordinarily obtains when a court's right to hear a cause which was heard and determined by it, depended on the existence of certain alleged jurisdictional facts, that the court found the facts to exist, cannot be in invoked in the present instance, because the Jasper county record and files show on their faces the non-existence of the essential jurisdictional fact that Mrs. Connor was in said county. What does appear on the face of the Jasper county proceeding is that Mrs. Connor was not there when process was served on her, nor at the hearing; but it nowhere affirmatively appears she was not in said county when Brown filed his information. With the record in this State, inasmuch as the Supreme Court indulges the same presumptions in favor of the validity of proceedings in probate courts, in cases whose subject-matters fall within their jurisdiction, as is indulged in favor of the validity of proceedings of courts of general jurisdiction, it is questionable if the presumption must not be indulged that Mrs. Connor was in Jasper county at the inception of the proceeding there, if her presence was essential to the validity of the order and judgment of the probate court. [Johnson v. Beasley, supra.] But in the view we take of this case, it may be determined on a broader ground. We do not assent to relator's construction of the statutes—do not agree that the actual bodily presence in the county where a probate court sits, of a person whose sanity is challenged,

is the condition on which said court may entertain jurisdiction of an inquiry concerning the matter. In the absence of any statute regulating the procedure, the rule always followed is that the chancery or probate court of the place of residence of the supposed lunatic, is the proper forum to conduct an inquiry as to his mental state. [22 Cyc. 1122, and cases cited in the notes.] The reason for this rule is that the relatives, friends, acquaintances and physician of the party to be examined—that is to say, the persons best acquainted with his habits, mind and character—will be found usually, in the vicinity of his residence, and it will be most convenient and inexpensive to conduct the investigation there; and no doubt the circumstance that the party's property is most often where his residence is, was of some influence in establishing the rule. This point came up before Lord ELDEN in Ex parte Smith, 1. Swanst. Ch., *3. The supposed lunatic had resided in a certain shire in Wales, but after becoming insane was removed to Swansea and put in charge of a physician who kept an asylum for lunatics. A commission was sued out of chancery to inquire of the alleged lunacy; whereupon two petitions were presented to the chancellor one praying the commission might be executed in Cardiganshire where Smith had resided, and the other that it might be executed in Swansea where he was con-fined for treatment. This inquiry involved an important right. Smith had married in July before he was adjudged insane in October, and his relatives wished to invalidate the marriage on the ground that he was insane when it was contracted. In disposing of the petition, Lord ELDEN said the old and settled law was not to grant a commission of lunacy to be executed at any other place than the residence of the supposed luna-tic; citing Ex parte Hall, 7 Ves. 261; that if a resident of London were conveyed into Essex, he still would be

a resident of the city, and no man could be said to reside in a place where he had been carried while he had not mind enough to make a change of residence. The case of In re Ganse, 9 Paige Ch. 416, presented the fact of a supposed lunatic who resided in the town of Fishkill where he owned considerable property, becoming deranged and wandering away to some place unknown to his relatives. The proceeding was to inquire into the sanity of the wanderer, and the court said the question was whether it ought to issue a commission without some evidence of the fact that the party to be inquired about was within the jurisdiction of the court. The matter was disposed of by treating the party as still a resident of New York and of Fishkill where he was domiciled at the time he lost his reason. The court said that since the decision of Lord HARDWICKE in Southcot's case (2 Ves., sec. 402) there could be no doubt of the right of a chancellor to issue a commission where a lunatic had lands within the chancellor's jurisdiction, though the lunatic was himself domiciled abroad. The opinion quoted from Stock's work on Persons *Non Compos Mentis,* wherein it is said "All persons permanently *non compos mentis* are proper objects of a commission of lunacy, provided they are natives of or residents of England; thus a commission may be granted against a foreigner in this country or against an Englishman whilst out of it." In the case of John M. B. Child, it appeared the alleged lunatic was an inmate of a State asylum in the county of Mercer, New Jersey, but before he was sent to the asylum had resided in Morris county where his property was. The question was where a commission to inquire into his lunacy should be executed. The court said neither the statute nor the rule of court gave any direction on the subject, but the regular practice was to direct the commission to the county where the lunatic regularly resided; citing several cases. The court fur-

ther said the execution of the commission at the place of the supposed lunatic's residence prior to his removal to the asylum, and where his property was, would be found to be the most convenient and appropriate course; since, if there was any doubt as to his sanity, an investigation at a place remote from the homes of his family and associates would be "open to grave observation." In In re O'Brien, 1 Ashmead Rep. (Pa.) 80, it appeared the common pleas court of Philadelphia county had issued on December 24, 1824, a commission of lunacy against Elizabeth O'Brien and she was adjudged insane on January 25, 1825, and a committee of her personal estate appointed. Afterwards an application was made to set aside this commission by James Griffin, who had been appointed committee of Mrs. O'Brien in a proceeding instituted in the common pleas court of Cumberland county, November 8, 1824. Griffin was appointed committee January 11, 1825, or fourteen days prior to the confirmation of the appointment made by the common pleas court of Philadelphia county. On this state of facts the latter court set aside its appointment of a committee, which corresponds to our guardian, on the ground that the proceeding in the court of Cumberland county had preceded, in every stage, the one in the court of Philadelphia county. In opposition to the motion to set aside, it was contended the proceeding in the Cumberland court was *coram non judice,* inasmuch as the person of the lunatic was essential to the exercise of such a jurisdiction and without it the proceeding would be void. This contention was overruled, and the validity of the appointment by the Cumberland court recognized on the settled principle that where two courts have co-ordinate jurisdiction of a cause, the jurisdiction remains exclusive in the one which first assumes to act. In Swartz v. West, 84 S. W. (Tex.) 282, it appeared Mrs. Leudthke was adjudged insane on March 18, 1894, by the county court of Bosque county, Texas,

and was afterwards committed to an asylum in San Antonio where she remained confined.    At the time she was adjudged a lunatic she and her husband resided in Bosque county, but some time afterwards her husband removed to Hamilton county and in the latter county, on October 23, 1903, a petition was presented to the county court and a guardian of her estate was appointed; she being at the time not in Hamilton county, but in the asylum in San Antonio.    On this state of facts, the validity of the appointment of the guardian was challenged on the ground the county court of said county had no jurisdiction, because Mrs. Leudthke was not a resident of Hamilton county at the time the county court appointed the guardian.    It was ruled the Hamilton court had jurisdiction over the person and estate of Mrs. Luedthke, though she was then confined in the asylum at San Antonio, inasmuch as it appeared her husband had removed from Bosque to Hamilton county, and, in the absence of a separation, the residence of the husband was the residence of his wife, and Mrs. Luedthke's residence was in Hamilton county, though she was in the asylum at San Antonio.    The foregoing are all cases which were determined without reference to a statute, except the Texas case, which was determined on a statute different in its phrasing from ours. It will be seen that unless legislation in Missouri has changed the law, it was perfectly competent for the Jasper county probate court to inquire into Mrs. Connor's sanity and appoint a guardian of her person and estate, if that was the place of her residence, even though she was at the time in the asylum in St. Louis county.    The Texas case (Swartz v. West) is authority for the proposition that the residence of the husband is the residence of the wife and continues to be, even though she is an inmate of an insane asylum elsewhere. We apprehend it will not be questioned that a wife's residence is where her husband resides.    [Schouler, Dom. Rel. (5 Ed.),

37; McPherson v. McPherson, 70 Mo. App. 330; and see, too, the numerous cases cited in the respondent's brief in said cause.] The rule that the domicile and residence of the wife follow her husband's has been applied when she lived elsewhere. In the McPherson case, supra, it was held a woman who resided in Missouri, on marrying a citizen of New York, became instantly a resident of New York, though she remained for a while in Missouri. And so it has been held an alien marrying a citizen of this country, becomes, by virtue of such marriage, a citizen of the United States; and that when an alien husband becomes a naturalized citizen here, his wife, though she has not migrated from the old country, becomes a citizen of the United States. [Luhrs v. Eimer, 80 N. Y. 171; Kelly v. Owen, 77 Wall. 496; Headman v. Rose, 63 Ga. 458; Schouler, Dom. Rel., sec. 39.] The case of Flynn v. Hancock, 80 S. W. 245, — Tex. —, is even more in point. Harriet Hancock had been adjudged a lunatic and confined in an asylum for the insane at Terrell, Texas. On March 15, 1902, a guardian of her estate was appointed in Lamar county, wherein she resided before being sent to the asylum. It was held her confinement in an asylum in another county than Lamar, did not oust the court of the latter county of power to appoint a guardian of her estate. The court said she was not deprived, by being placed in the asylum, of her residence in Lamar county, within the purview of the statutes. Our statutes say the place where the family of a person resides shall be deemed the residence of such person. [R. S. 1899, sec. 4160, clause 17.] Mrs. Connor's family, her husband, resided in Joplin, which city, we have no doubt, was her residence during the time she has been confined in St. Vincent's Asylum. But it is argued that if she was not a resident of St. Louis county during the life of her husband, she became a resident of it at his death. No authority has been cited in support of this position,

and it is opposed to the decision in Flynn v. Hancock, supra, wherein the like fact existed, and we think, to sound reason. It is admitted Mrs. Connor resided in Joplin prior to her marriage and that she and her husband continued to reside there until she became insane; that she returned to her home there during the brief interval she enjoyed her reason in 1889; that all her property is there and that she was insane when this proceeding was instituted. To accomplish a change of residence would require an intention or purpose on her part to change it, and nothing was shown to warrant the inference of such an intention; if, indeed, it could be shown in view of her lunacy. An authority, somewhat in point in this connection, is Marnhenecke v. Grothaus, 72 Mo. 204. The parents of Maria Marnhenecke had resided in St. Louis, where they died while she was a small child, and her uncle Frederick Koehring was appointed her guardian and curator by the probate court of St. Louis. He resided at the time in Franklin county and subsequently took the child there. Two or three years afterwards he died and the Franklin court appointed William Kelso guardian and curator. About the same time the probate court of St. Louis, which had refused to relinquish the guardianship of the child, appointed John Koehring, an uncle, curator. It was contended this appointment was bad because the minor lived at the time in Franklin county and not in St. Louis; but it was ruled that inasmuch as she had been taken by her first guardian to his home in Franklin county, this did not change her domicile from St. Louis, so as to give jurisdiction to the probate court of Franklin county, but her domicile continued to be in St. Louis. It will be observed Mr. Connor died March 29, 1907, and the proceeding in the Jasper court was instituted April 2, less than a week afterwards. We hold Mrs. Connor was then a resident of Jasper county and not of St. Louis county.

The next point to be examined is whether or not, this being true, the Jasper county probate court might lawfully inquire into Mrs. Connor's mental state, and if found to be unsound and she incapable of managing her affairs, appoint a guardian as provided in sections 3650 and 3654 Mo. Ann. Stat. ch. 39; R. S. 1899, ch. 39 as amended by the laws of 1903. That these statutes do not lose sight of the question of property in insanity proceedings, is made manifest by the last clause of section 3650, which says the probate court shall not have jurisdiction to inquire into the sanity of any person of no property. Inasmuch as the existence of property controls the exercise of the jurisdiction of a probate court to inquire in a particular instance, it looked reasonable that the situation of property should have some bearing on the question of what court may exercise jurisdiction to examine persons said to be insane and appoint a guardian if he is found to be. It would be more convenient to have the curatorship of a lunatic's property under the supervision of the court where the property lies, than under the supervision of a distant court. But aside from the argument of convenience, the proposition that no probate court can entertain an inquiry into the sanity of a supposed lunatic unless the person accused is in the county at the time, is untenable in view of other provisions of the statutes. It is true section 3650 says the probate court may inquire, on information in writing, into the sanity of any person in its county, etc.; but section 3653, which refers to section 3650, says whenever any judge of the county court, justice of the peace, sheriff, coroner, or constable, shall discover any person *resident in his county* (italics ours) to be of unsound mind, as in section 3650 mentioned, it shall be his duty to make application to the probate court for the exercise of its jurisdiction; and thereupon the like proceedings shall be had as in the case of informations by unofficial per-

sons.    That language shows residence gives jurisdiction.    The two statutes relate to the same proceeding, namely, the inquiry into the mental state of persons whose sanity is questioned.    One section provides for an inquiry on an information in writing filed by a nonofficial person; and the other for an inquiry on the application of an official.    But in either event, the same character of proceeding follows.    Now one section uses the words "in its county" and the other the words "resident of his county."    The latter words warrant a probate court to investigate the sanity of any person informed against by one of the officials named, if the person is a resident of the county, without saying or implying that he must be in it when the information is filed.    This being true, it cannot reasonably be held that the words "in his county" used in section 3650, preclude the exercise of jurisdiction by a probate court in an insanity proceeding instituted by a private informant, when the alleged lunatic is a resident of, but not at the time in, the county.    These statutes are in the highest degree *in pari materia,* and by no rule of construction can one be given an effect different from what is given the other, as to the immediate point.    We must not be understood to say a probate court may not inquire, on the filing of a proper information, into the sanity of a person who is in the county, even if he does not reside in it.    It may be proper to conduct such an inquiry if a lunatic wanders from the county of his residence into another county, or if a person becomes insane when absent from his home, or perhaps in any case when no prior proceeding in his home county interferes. This may be necessary for the welfare of the insane and the safety of citizens.    [Cox v. Osage Co., 103 Mo. 385, 15 S. W. 763.] Our view is that section 3650 was enacted to supplement, instead of abrogate, the chancery rule regarding the venue of insanity inquiries.    Under such circumstances as are before us, where the person alleged

to be of unsound mind has always resided and still re-
sides in a certain county, and such persons's entire
estate is in said county, we hold the probate court there-
of is not deprived of jurisdiction to conduct an inquiry,
though the party to be inquired about is confined in an
asylum for the insane in another county. Our statutes
have provided for private asylums, and also for State
asylums for the insane where private patients may be
kept by their relatives or at the expense of their estate.
Those public asylums are few in number and it could
not have been the intention of the Legislature to require
all proceedings to appoint guardians for inmates of the
asylums, to be held in the probate courts of the coun-
ties where the asylums are and prohibit the courts of
the home counties of the inmates, where their relatives,
friends and possessions are, from exercising jurisdic-
tion. It follows that the proceeding in the Jasper court
was not *coram non judice* or the judgment therein a
nullity; and as it preceded the attempt to call into exer-
cise the jurisdiction of the St. Louis county probate
court, the proceeding in the latter court ought not to
be reinstated or pass into judgment.

The judgment is affirmed. All concur.